**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

JUAN CARLOS CHAVEZ,

                     Plaintiff,

vs.                                         Case No. 3:14-cv-110-J-39JBT

JOHN D. PALMER, etc.; et al.,

                     Defendants.

_____

## ORDER

### I.    Status

       Plaintiff Juan Carlos Chavez is a Florida death row inmate who is proceeding on an

Amended Complaint (Amended Complaint) (Doc. 15) and is scheduled to be executed on

Wednesday, February 12, 2014.[1]  On January 28, 2014, through counsel, he, along with

another death row inmate, Paul A. Howell, filed a Complaint (Doc. 1) pursuant to 42 U.S.C.

§ 1983, alleging that executions performed using Florida's recently revised lethal injection

protocol[2] (Midazolam Protocol) will subject them to cruel and unusual punishment in violation

of the Eighth and Fourteenth Amendments to the United States Constitution; the lethal

injection process will violate their Fourteenth Amendment right to due process; and the

Defendants are denying them their First Amendment right to access public documents, which

_____

    [1] Plaintiff submitted an Appendix to Amended Complaint (App.) (Docs. 16 - 21).  He filed
a Supplemental Appendix to Amended Complaint (Doc. 45) on February 7, 2014.

    [2] The Florida Department of Corrections revised its lethal injection protocol to substitute
midazolam hydrochloride (midazolam) for pentobarbital as the first drug in its three-drug
lethal injection procedure on September 9, 2013.

also violates their Fourteenth Amendment due process and equal protection rights. Complaint at 1-3.  On January 29, 2014, the Court dismissed Plaintiff Howell from the action without prejudice to his right to file a new action.  Order (Doc. 6).  In addition, the Court granted Plaintiff Chavez leave to proceed in forma pauperis, and the Court directed Plaintiff Chavez to file an amended complaint by February 3, 2014, at 5:00 p.m.  Id.  Finally, the Court appointed Robert Norgard to represent Plaintiff Chavez.  Id.

On February 3, 2014, Plaintiff Chavez filed his Amended Complaint.  He claims: (1) executions performed using the Midazolam Protocol will subject him to cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution; (2) executions performed using vecuronium bromide, a paralytic blocker, will subject Plaintiff to forced medication in violation of the Due Process Clause of the Fourteenth Amendment; (3) executions performed using the Midazolam Protocol will subject him to cruel and unusual punishment in violation of the Eighth Amendment as the evolving standards of decency have shifted to more humane single-drug protocols and the use of midazolam amounts to human experimentation; and (4) repeated refusals by the Defendants to produce requested documents subject Plaintiff to a denial of due process and equal protection of the law in violation of the Fourteenth Amendment and a denial of the right to access public documents pertaining to governmental proceedings in violation of the First Amendment. Amended Complaint at 1-3.[3]

---

[3] The Court notes that Counts I-V (Count I - violation of right to be free from cruel and unusual punishment pursuant to the Eighth Amendment to the United States Constitution; Count II - violation of liberty rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution; Count III - Defendants' refusal to adopt a one-

2

As relief, Plaintiff seeks: (1) a temporary, preliminary, and permanent injunction enjoining Defendants from executing Plaintiff by means of the Midazolam Protocol; (2) an order declaring the Midazolam Protocol unconstitutional under the Eighth and Fourteenth Amendments to the United States Constitution; and/or Art. I §§ 9, 17, Florida Constitution; and/or Fla. Stat. § 922.105; and/or 45 C.F.R. § 46 et seq.; and, as applied under the First Amendment to the United States Constitution; (3) an order directing Defendants to provide requested discovery; and (4) other relief deemed just and appropriate by the Court. Amended Complaint at 34.

Upon review of the Amended Complaint, the Court entered an Order (Doc. 22) directing Defendants to file a response to the Amended Complaint and both parties to provide additional briefing on the issue of whether this case is distinguishable from Muhammad v. Crews, No. 3:13-cv-1587-J-32JBT, 2013 WL 6844489 (M.D. Fla. Dec. 27, 2013), aff'd, Muhammad v. Sec'y, Fla. Dep't of Corr., 739 F.3d 683 (11th Cir. 2014), cert. denied, No. 13-8154, 2014 WL 50730 (U.S. Jan. 7, 2014). Also, the Court scheduled a limited evidentiary hearing on Wednesday, February 5, 2014, permitting Plaintiff to call Dr. David Lubarsky, M.D., permitting Defendants to call an expert to offer testimony regarding

---

drug protocol violates the evolving standards of decency that mark the progress of a maturing society encompassed in the Eighth Amendment; Count IV - Defendants' 2013 protocol violates the prohibition set forth in 45 C.F.R. § 46 and international norms against experimentation on human subjects; Count V - violation of First, Fourteenth, and Eighth Amendment rights by refusing access to public documents) presented in the Amended Complaint do not mirror the statement of claims at the outset of the document. See Amended Complaint at 29-34. However, for the purpose of rendering its decision on the request for emergency relief contained within the Motion to Stay (Doc. 28), the Court simply summarizes the claims as stated above.

the issues discussed in Dr. Lubarsky's Declaration, and permitting cross examination of these witnesses.[4]   Also, counsel were notified to be prepared to present argument concerning whether this case is distinguishable from Muhammad.

Plaintiff filed a Motion for Temporary Restraining Order, Preliminary Injunction, and/or Stay of Execution and Supplemental Brief Regarding Muhammad (Motion to Stay) (Doc. 28) on February 4, 2014.  Defendants, on February 4, 2014, filed their Response and Motion to Dismiss § 1983 Amended Complaint and/or for Summary Judgment (Motion to Dismiss and/or for Summary Judgment) (Doc. 23); Response to Motion for Stay (Doc. 27); and Court Ordered Briefing on Muhammad (Doc. 29).   On February 5, 2014, the Court ordered expedited service of process upon Defendants (Doc. 37).  The returns of service (Docs. 48 & 49) reflect executed service of process.  Defendants were given leave to adopt the previously filed responses.  Id.  The Court presided over a limited evidentiary hearing on February 5, 2014.  Immediately thereafter, Defendants filed their Response to Motion for Temporary Restraining Order, Preliminary Injunction and/or Stay of Execution (Response) (Doc. 41).  The next day, on February 6, 2014, Defendants filed their Notice of Adoption of Prior Responses (Doc. 44).

_____

[4] Because of the similarities in the arguments raised by Plaintiff with those most recently addressed with respect to the execution of Muhammad using the Midazolam Protocol, and because of the absence of an evidentiary hearing in the state courts regarding Plaintiff's contention of a substantial change to Florida's protocol as allegedly evidenced by Dr. Lubarsky's Declaration, the Court required in the limited time available prior to the scheduled execution, an evidentiary hearing.

On February 7, 2014, the court reporter filed the transcript of the evidentiary hearing. Plaintiff's Motion to Stay is ripe for review.

## II.   Procedural History

Florida Governor Rick Scott signed a death warrant on January 2, 2014, and scheduled Plaintiff's execution for February 12, 2014, at 6:00 p.m.  App. at 14-15.  Prior to the Florida Supreme Court's decision affirming the denial of Plaintiff's second successive motion for post conviction relief, Plaintiff filed this federal suit making a challenge to Florida's Midazolam Protocol, relying on the Declaration of Dr. David Lubarsky, M.D.  Very recently, the Supreme Court of Florida issued its opinion affirming the denial of Plaintiff's second successive motion for post conviction relief.  Chavez v. State, No. SC14-35, 2014 WL 346026 (Fla. Jan. 31, 2014) (per curiam) (not yet released for publication) (petition for cert. filed February 6, 2012).[5]  The court, in brief, provided the following background information:

> Chavez was convicted of the first-degree murder, kidnapping, and sexual battery of nine-year-old Samuel James ("Jimmy") Ryce and was sentenced to death in accordance with a unanimous jury recommendation. Chavez v. State, 12 So.3d 199, 203 (Fla.), cert. denied, 558 U.S. 996 (2009). Chavez confessed that on the afternoon of September 11, 1995, he abducted the child at gunpoint from a school bus stop in rural Miami–Dade County and sexually assaulted the child before fatally shooting him. Id. In 2002, this Court upheld the convictions and sentences on direct appeal. Id. Chavez subsequently filed an initial postconviction motion pursuant to rule 3.851. After relief was denied by the circuit court, Chavez appealed the denial and filed a petition for writ of habeas corpus

---

[5] In addition, Plaintiff filed an application for stay of execution pending resolution of his petition for certiorari (Case Nos. 13-8605 & 13A813 in the United States Supreme Court).

with this Court. Id. This Court upheld the denial of postconviction relief and denied the habeas petition. Id. at 203.

Chavez next filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the Southern District of Florida. Chavez v. Sec'y, Fla. Dep't of Corr., 647 F.3d 1057, 1059 (11th Cir. 2011), cert. denied, 132 S.Ct. 1018 (2012). Chavez recognized that the petition was filed outside of the one-year statute of limitations period provided by 28 U.S.C. § 2244(d) for seeking federal habeas relief, but sought equitable tolling of the statute of limitations. Id. The federal district court dismissed Chavez's habeas petition, concluding that even if all allegations in the petition were true, Chavez would still not be entitled to enough equitable tolling to bring the filing within the statute of limitations period. Id. The United States Court of Appeals for the Eleventh Circuit affirmed the dismissal. Id. at 1073.

On April 16, 2012, Chavez filed a successive motion for postconviction relief. Chavez first asserted that Florida's capital sentencing scheme violates Ring v. Arizona, 536 U.S. 584 (2002), in light of the decision of the federal district court in Evans v. McNeil, 2011 WL 9717450 (S.D. Fla. June 20, 2011), aff'd in part and rev'd in part, 699 F.3d 1249 (11th Cir. 2012), cert. denied, 133 S.Ct. 2393 (2013). Second, Chavez contended that he was entitled to relief in state court pursuant to Martinez v. Ryan, 132 S.Ct. 1309 (2012). The circuit court denied relief, and this Court affirmed the denial in a brief order. See Chavez v. State, 2013 WL 5629607 (Fla. Oct. 11, 2013) (table).

After Governor Scott signed the warrant in this case, Chavez filed numerous public records requests. On January 9, 2014, Chavez filed a second successive motion for postconviction relief, which presented three claims. First, Chavez requested that the circuit court stay the execution while he pursues his claims in federal court pursuant to Martinez. **Second, Chavez challenged the constitutionality of lethal injection in Florida.** Lastly, Chavez contended that he was denied due process during the clemency proceedings. **Chavez requested an evidentiary hearing on the lethal injection** and clemency claims.

6

> After a <u>Huff</u> [<u>v. State</u>, 622 So.2d 982 (Fla. 1993)] hearing, the circuit court entered an order that summarily denied all claims and rejected Chavez's request for a stay. The circuit court also entered orders denying Chavez's requests for public records filed pursuant to Florida Rule of Criminal Procedure 3.852(i) from the Florida Department of Corrections (DOC), the Florida Department of Law Enforcement (FDLE), the Office of the Medical Examiner for the Eighth District, and the Florida Parole Commission and its Office of Executive Clemency.
>
> This appeal followed.

<u>Chavez</u>, 2014 WL 346026, at *1- *2 (emphasis added) (footnote omitted).

In its Order affirming the denial of Plaintiff's 3.851 motion, the Florida Supreme Court found the following:

> In <u>Muhammad</u>, we held that the use of midazolam hydrochloride as the first drug in the lethal injection protocol did not violate the Eighth Amendment. <u>Muhammad</u>, 38 Fla. L. Weekly at S923, S929. We also considered and rejected the contentions that: (1) movements by Happ during his execution establish that Happ was conscious and experienced pain; (2) FDLE agent Feltgen failed to fulfill his role as a monitor pursuant to the lethal injection protocol; and (3) Florida is constitutionally required to change its three-drug protocol to a one-drug protocol. <u>See</u> <u>id</u>. at S923–24.
>
> Chavez contends that despite our detailed ruling in <u>Muhammad</u>, we should remand for an evidentiary hearing so that he may offer additional evidence to that which was presented in <u>Muhammad</u>. We reject this claim. Summary denial of a lethal injection challenge is proper where the asserted reasons for holding an evidentiary hearing are based upon conjecture or speculation. <u>See</u> <u>generally</u> <u>Foster v. State</u>, 38 Fla. L. Weekly S756, S766 (Fla. 2013). **Chavez has failed to proffer any witnesses or evidence that he would present during an evidentiary hearing. Thus, the assertion by Chavez that he could establish the unconstitutionality of Florida's lethal injection protocol is completely speculative. We conclude that his request for an evidentiary hearing was**

> **properly denied, and we affirm the denial of this claim pursuant to Muhammad.**

Chavez, 2014 WL 346026, at *4 (emphasis added).

## III. Constitutional Provisions

Plaintiff urges this Court to find that his case is clearly distinguishable from Muhammad and that he has a substantial likelihood of success on the merits of his Motion to Stay. In support, he wages a three-pronged attack on the Midazolam Protocol. First, he claims that his Eighth Amendment claim has a substantial likelihood of success because midazolam is a sedative, not an anesthetic; it is not designed to induce a surgical plane of anesthesia by itself, nor has the Food and Drug Administration (FDA) approved it for such purpose because it has no analgesic qualities. Next, he claims that his Eighth Amendment claim has a substantial likelihood of success because the Midazolam Protocol violates the "evolving standards of decency" because there is a known available alternative, a single-drug protocol employing an overdose of a barbiturate, rendering the inmate unconscious and then resulting in death without the risks associated with the Midazolam Protocol. Finally, he claims that his Fourteenth Amendment claim has a substantial likelihood of success because he has a liberty interest in not being forcibly administered a drug that is not medically appropriate, vecuronium bromide (a paralytic), relying on Sell v. United States, 539 U.S. 166, 180 (2003).

Initially, the Court looks to the seminal Supreme Court case on lethal injection protocols, Baze v. Rees, 553 U.S. 35, 47 (2008) (plurality opinion), and the settled principle that "capital punishment is constitutional." The Eighth Amendment, applicable to the States

8

through the Due Process Clause of the Fourteenth Amendment, provides that cruel and unusual punishments not be inflicted. Id.  It does not provide that the execution process be free of "all risk of pain[.]"  Id.  In order to establish an Eighth Amendment violation, "the conditions presenting the risk must be 'sure or very likely to cause serious illness and needless suffering,' and give rise to 'sufficiently imminent dangers.'"  Id. at 50 (emphasis in original) (quoting Helling v. McKinney, 509 U.S. 25, 33, 34-35 (1993)).  Moreover, accidental pain or inescapable pain caused by the consequence of death itself is not the sort of "objectively intolerable risk of harm" prohibited by the Eighth Amendment.  Id. at 50.  Indeed, the Supreme Court went on to say that in order to prevail on an Eighth Amendment claim, there "must be a 'substantial risk of serious harm,'" and "'an objectively intolerable risk of harm[.]'"  Baze, 553 U.S. at 50 (quoting Farmer v. Brennan, 511 U.S. 825, 842, 846 (1994)).

Additionally, after concluding that the State of Kentucky's three-drug lethal injection protocol (consisting of thiopental, "a fast-acting barbiturate sedative that induces a deep, comalike unconsciousness when given in the amounts used for lethal injection[;]" pancuronium bromide, "a paralytic agent that inhibits all muscular-skeletal movements and, by paralyzing the diaphragm, stops respiration[;]" and potassium chloride, a drug that "interferes with the electrical signals that stimulate the contractions of the heart, inducing cardiac arrest[]") was consistent with the Eighth Amendment, Baze, 553 U.S. at 44 (internal citations omitted), a plurality of the Court opined:

> A stay of execution may not be granted on grounds such as
> those asserted here unless the condemned prisoner establishes
> that the State's lethal injection protocol creates a demonstrated
> risk of severe pain.  He must show that the risk is substantial
> when compared to the known and available alternatives.  A

> State with a lethal injection protocol substantially similar to the
> protocol we uphold today would not create a risk that meets this
> standard.

Id. at 61.

With respect to Plaintiff's contention that there is a known, available alternative to the Midazolam Protocol, using only one drug, Baze provides that courts should not be transformed into "boards of inquiry" on determining "best practices" for execution procedures, nor should the courts be embroiled "in ongoing scientific controversies beyond their expertise[.]" Id. at 51.  Indeed, a showing of "a slightly or marginally safer alternative" is insufficient to satisfy the risk of harm that is actionable under the Cruel and Unusual Punishment Clause of the Eighth Amendment.  Id.

In Roper v. Simmons, 543 U.S. 551 (2005), the United States Supreme Court construed the Eighth Amendment to require that punishment for crimes comport with "the evolving standards of decency that mark the progress of a maturing society[.]" Id. at 561 (quoting Trop v. Dulles, 356 U.S. 86, 100-101 (1958) (plurality opinion)).  In deciding that the Eighth Amendment precluded Florida's sentence of life imprisonment without parole to a juvenile convicted of a non-homicidal crime, the court, in Graham v. Florida, 560 U.S. 48 (2010), required the consideration of "objective indicia of society's standards, as expressed in legislative enactments and state practice[,]" id. at 61 (quoting Roper at 572), and "the standards elaborated by controlling precedents and by the Court's own understanding and interpretation of the Eighth Amendment's text, history, meaning, and purpose[.]" Id. at 61 (quoting Kennedy v. La., 554 U.S. 407, 421 (2008)).

10

In addition, Plaintiff relies on a liberty interest claim under the Due Process Clause of the Fourteenth Amendment in his Motion to Stay.  He contends that the Constitution prohibits the State from forcefully administering vecuronium bromide because there is no important governmental interest as it is not the drug in the Midazolam Protocol used to cause death and it does not create a more humane process for administering executions.  Plaintiff relies on Sell v. United States, 539 U.S. 166 (2003).  The Court looks to its  predecessor cases addressing the issue of forcible administration of medication in correctional institutions.  Of note, there is "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment."  Washington v. Harper, 494 U.S. 210, 221-22 (1990).  However, "given the requirements of the prison environment, the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest."  Id. at 227.  See Riggins v. Nevada, 504 U.S. 127, 135 (1992) (finding a Fourteenth Amendment liberty interest in pretrial detainees avoiding forced antipsychotic medication); Spaulding v. Poitier, No. 12-14007, 2013 WL 6405024, at *2 (11th Cir. 2013) (unpublished)[6] (per curiam) (recognizing that the forcible injection of medication into a non-consenting detainee's body constitutes "a substantial interference with that person's liberty").

_____

[6] The Court recognizes that any unpublished Eleventh Circuit decision constitutes persuasive authority and is not binding precedent.  See 11th Cir. Rule 36-2.

In <u>Sell</u>, 539 U.S. at 179-81, the Supreme Court found that it is constitutionally permissible to administer antipsychotic medication to a mentally ill detainee facing serious criminal charges in order to render him competent to stand trial if a four-factor test is met. This standard provides that the involuntary administration of a drug to render a detainee competent for criminal trial purposes should take place only if there is an important governmental interest at stake; the medication will significantly further those concomitant state interests; the court concludes that the involuntary medication is necessary to further those interests; and the administration of the drugs is medically appropriate (in the patient's best interest with respect to his medical condition). <u>Id</u>. at 180-81. Plaintiff seeks to extend the reasoning of <u>Sell</u> to the circumstances at bar, asserting the <u>Sell</u> test is applicable to the forced administration of drugs in a lethal injection process in which the intended result is the condemned's death, and more specifically, he urges the Court to find that the forced administration of vecuronium bromide in the Midazolam Protocol does not satisfy the <u>Sell</u> test and its use in the execution process should be prohibited.

## IV.   Procedural Bar

In their Response, Defendants urge this Court to find that Plaintiff has no likelihood of success on the merits because his claims are barred by the statute of limitations, barred by the doctrine of res judicata, and barred as unexhausted for failure to exhaust institutional administrative remedies pursuant to the Prison Litigation Reform Act (PLRA). Response at 4. Defendants first address the question of whether the method of execution claim is barred by the applicable statute of limitations, <u>id</u>. at 4-10; second, Defendants address res judicata and the preclusive effect of a state court judgment, <u>id</u>. at 10-16; and third, Defendants raise

12

the matter in abatement of exhaustion of administrative remedies, id. at 16-19.  See Tilus v. Kelly, 510 F. App'x 864, 865 (11th Cir. 2013) (per curiam) (not selected for publication in the Federal Reporter) (recognizing that an assertion of failure to exhaust administrative remedies under the PLRA is a matter in abatement that should be presented in a motion to dismiss or treated as such) (citing Bryant v. Rich, 530 F.3d 1368, 1374-75 (11th Cir. 2008)).

## V.   Stay of Execution

Recently, the Eleventh Circuit reiterated the showing that Plaintiff must make to be entitled to a stay of execution:

> A stay of execution is equitable relief which this Court may grant only if the moving party shows that: (1) he has a substantial likelihood of success on the merits; (2) he will suffer irreparable injury unless the injunction issues; (3) the stay would not substantially harm the other litigant; and (4) if issued, the injunction would not be adverse to the public interest.  Valle v. Singer, 655 F.3d 1223, 1225 (11th Cir. 2011).

Mann v. Palmer, 713 F.3d 1306, 1310 (11th Cir.) (quoting Valle v. Singer, 655 F.3d 1223, 1225 (11th Cir. 2011)), cert. denied, 133 S.Ct. 1752 (2013).  Therefore, the stay of execution sought by Plaintiff may only be granted if Plaintiff establishes the above mentioned factors. Muhammad, 739 F.3d at 688 (citing Powell v. Thomas, 641 F.3d 1255, 1257 (11th Cir. 2011)).   The Court need not address the remaining factors if Plaintiff cannot satisfy his burden of demonstrating a substantial likelihood of success as to at least one of his claims, as his Motion to Stay would be due to be denied.  See Ferguson v. Warden, Fla. State Prison, 493 F. App'x 22, 26 (11th Cir.) (per curiam) (not selected for publication in the Federal Reporter), cert. denied, 133 S.Ct. 498 (2012); Valle v. Singer, 655 F.3d 1223, 1225 (11th Cir.) (per curiam), cert. denied, 132 S.Ct. 73 (2011).

13

**VI.    Evidentiary Hearing**

Plaintiff contends that this action is not barred by the statute of limitations because the Florida Department of Corrections made a substantial change to the lethal injection protocol on September 9, 2013, by substituting midazolam for pentobarbital as the first drug in the three-drug protocol.  Motion to Stay at 2-4.  Plaintiff's claim is similar to that raised in Arthur v. Thomas, 674 F.3d 1257, 1262 (11th Cir. 2012) (per curiam).  At issue was whether a significant change had occurred in Alabama's method of execution.  Id. at 1260.  The state moved to dismiss the Eighth and Fourteenth Amendment claims on statute of limitations grounds, and the district court granted the motion to dismiss.  Id. at 1259.  In reversing the district court's dismissal of the Eighth Amendment claim, the Court recognized that whether or not a significant change had occurred in a method of execution was a fact dependent inquiry.  Id. at 1260.  Of import, this Court also recognized the need for an evidentiary hearing regarding changes in Florida's lethal injection protocol.  Pardo v. Palmer, No. 12-1328-J-32JBT, 2012 WL 6106331, at *1 (M.D. Fla. Dec. 10, 2012) (not reported in F.Supp.2d).  See Pardo v. Palmer, 500 F. App'x 901, 904 (11th Cir.) (per curiam) (not selected for publication in the Federal Reporter) (affirming this Court's denial of a motion for stay, and stating: "the question of whether a significant change has occurred in Florida's lethal injection protocol" is properly treated as a "fact-dependent inquiry."), cert. denied, 133 S.Ct 815 (2012).

Based on the principles set forth in Arthur and Pardo, and presented with the Declaration of David Lubarsky, M.D. (Declaration), App. at 16-28, the Court scheduled a limited evidentiary hearing, allowing expert witness testimony and cross examination of those

experts.  Dr. Lubarsky submitted that he was prepared to present conclusions drawn from reviewing eyewitness accounts of the Midazolam Protocol executions of William Happ, Darius Kimbrough, and Askari Muhammad.  Id. at 2.

On February 5, 2014, the Court conducted a hearing which included argument on the Motion to Stay and whether this case is distinguishable from Muhammad.  In addition, the Court heard limited testimony from witnesses.  The transcript of that hearing is filed in the record.  Transcript of Evidentiary Hearing Held on February 5, 2014 (Tr.) (Doc. 46).  In the course of the hearing, two proffers were made during Dr. Lubarsky's testimony on direct.  The Court reserved ruling on these proffers of testimony.  Upon review, the Court finds the proffered testimony admissible.  Therefore, the Court will consider the testimony in rendering its decision.

The Court's decision addressing the Motion to Stay relies in part on the argument and testimony heard at the hearing and it is incorporated by reference in this opinion.  The Court has undertaken extensive study of the filings, exhibits, and the relevant case law as well.  Based on that review and the content of the hearing, the Court finds that Plaintiff cannot demonstrate a substantial likelihood of success on the merits.  Therefore, as further explained below, Plaintiff's Motion to Stay is due to be denied.  This decision issues without delay to allow Plaintiff to seek emergency appellate review, if he so chooses.

**VII.    Substantial likelihood of Success on the Merits**

15

### A.    Statute of Limitations

As noted by Defendants in their Response, "a method of execution claim accrues on the later of the date on which state review is complete, or the date on which the capital litigant becomes subject to a new or substantially changed execution protocol." McNair v. Allen, 515 F.3d 1168, 1174 (11th Cir. 2008).  In Plaintiff's case, state review was complete on June 23, 2003, when the Supreme Court of the United States denied his petition for a writ of certiorari to the Supreme Court of Florida on direct appeal. Chavez v. Florida, 539 U.S. 947 (2003).  The claims raised in the Amended Complaint are subject to Florida's four-year personal injury statute of limitations. Van Poyck v. McCollum, 646 F.3d 865, 867 (11th Cir. 2011) (per curiam) (citing Henyard v. Sec'y, Dep't of Corr., 543 F.3d 644, 647 (11th Cir. 2008) (per curiam)).  Thus, the statute of limitations ran on June 23, 2007.  Response at 5. See Mann, 713 F.3d at 1312 ("[t]he statute of limitations for challenges to the adoption of lethal injection as the method of execution in Florida began to run on February 13, 2000, and expired on February 13, 2004") (citing Henyard v. Sec'y, Dep't of Corr., 543 F.3d 644, 647 (11th Cir. 2008)).  Therefore, absent a substantial change in Florida's execution protocol, Plaintiff's claims are barred by Florida's statute of limitations.  Ferguson, 493 Fed. App'x at 24 (finding clear Circuit precedent that, for the purpose of restarting the statute of limitations, the use of sodium pentobarbital as the first drug in the three-drug protocol did not constitute a substantial change).

Plaintiff's burden is to establish a substantial likelihood of successfully proving either: that the State of Florida's use of midazolam as the first of three drugs in its execution protocol violates his right to be free from cruel and unusual punishment; or that the State of

16

Florida's continued use of a three-drug protocol violates evolving standards of decency embodied within the Eighth Amendment; or that forced injection of vecuronium bromide, a paralytic drug, violates a Fourteenth Amendment right to liberty. Relying on the decisions of the Florida Supreme Court, this Court, and the Eleventh Circuit in <u>Muhammad</u>, Defendants argue that Plaintiff's claims are barred by the statute of limitations. Response at 8-10.

Of significance, in <u>Muhammad</u>, this Court found:

> the DOC **has substituted one anesthetizing drug for another** as the first drug in the three-drug protocol. No other changes were made to the lethal injection protocol**. Moreover, the testimony of both Dr. Heath and Dr. Evans at the evidentiary hearing in state court establishes that midazolam hydrochloride is routinely used as a pre-anesthetic and as an anesthetic in minor surgical procedures, and that the 500 milligram dosage called for in Florida's lethal injection protocol would not only induce unconsciousness, but would ultimately cause death. Thus, the substitution of midazolam hydrochloride for pentobarbital does not constitute a substantial change to the execution protocol within the meaning of Eleventh Circuit precedent.** Therefore, Muhammad has not shown a substantial likelihood of success on the merits of his claims because it appears that they are barred by Florida's four-year statute of limitations.

<u>Muhammad</u>, 2013 WL 6844489, at *6 (footnote omitted) (emphasis added). In finding that the Florida Department of Corrections, in the September 9, 2013 Midazolam Protocol, was substituting "one anesthetizing drug for another as the first drug in the three-drug protocol[,]" <u>id</u>., this Court relied heavily upon Eleventh Circuit precedent holding that Florida's substitution of pentobarbital for sodium pentothal as the first drug in the three-drug protocol did not constitute a significant change in Florida's protocol, relying on <u>Mann</u>, 713 F.3d at

1313 (citing <u>Valle v. Singer</u>, 655 F.3d at 1233) and <u>Pardo v. Palmer</u>, 500 F. App'x at 904 (quoting <u>Ferguson</u>, 493 F. App'x at 24).

The Eleventh Circuit affirmed this Court's decision denying a stay and did not grant Muhammad's renewed request for a stay. <u>Muhammad</u>, 739 F.3d at 688. The Circuit Court rested its decision on res judicata, finding res judicata barred Muhammad from relitigating his Eighth Amendment claim in federal court. <u>Id</u>. at 688-89. The Eleventh Circuit further noted that federal review of Muhammad's Eighth Amendment claim was available in the Supreme Court of the United States, where Muhammad's petition for writ of certiorari was pending from the decision of the Supreme Court of Florida. <u>Id</u>. at 689.

Therefore, this Court certainly has persuasive authority, the Court's reasoned decision in <u>Muhammad</u>, upon which to rely, recognizing, of course, that in this instance, Plaintiff Chavez is offering the Declaration and testimony of his expert, Dr. Lubarsky, and claiming that there are new claims and evidence upon which this Court may rely to reach its decision on whether a stay should be granted.

## B.    Plaintiff's Eighth Amendment Claims

In his Motion to Stay, Plaintiff claims Florida's three-drug lethal injection protocol will subject him to an unnecessary risk of serious pain and suffering in violation of the Eighth Amendment's proscription against cruel and unusual punishment. Florida's protocol, most recently amended on September 9, 2013, calls for the serial intravenous administration of the following three chemical substances:  500 milligrams of midazolam; followed by 100 milligrams of vecuronium bromide, a neuromuscular blocking agent or paralytic; followed by 240 milliequivalents of potassium chloride, which causes cardiac arrest and death. <u>See</u> App.

18

at 1-13  (Execution by Lethal Injection Procedures, dated September 9, 2013).[7]  Plaintiff's

Eighth Amendment challenge relates to the use of midazolam as the first drug in the three-

drug protocol.  In his attempt to distinguish his case from <u>Muhammad</u>, Plaintiff first alleges

that midazolam is "<u>not</u> routinely used as a sole anesthetic because Midazolam has no

analgesic (pain relieving) properties and without some type of opioid would not protect a

person from noxious and painful stimuli such as vecuronium bromide and potassium

chloride." Motion to Stay at 5 (emphasis added).  Secondly, he asserts "there is no evidence

that supports a claim that 500 mg of midazolam would produce a state of unconsciousness

that would ensure the person is not subject to serious pain and suffering."  <u>Id</u>.  Thirdly, he

submits that "midazolam involves a substantial risk of paradoxical reactions and adverse

reactions."  <u>Id</u>.  Finally, he states that "midazolam will not in itself cause death."  <u>Id</u>.

        In support of these contentions, Plaintiff states that "midazolam is a sedative, not an

anesthetic, and it is not designed to induce a surgical plane of anesthesia by itself, nor has

the FDA approved it for such purpose." <u>Id</u>. at 6.  He explains that midazolam has "no pain

reducing qualities."  <u>Id</u>.  He further asserts that unlike sodium thiopental and pentobarbital

which have undergone substantial review for use in other execution protocols as the first

drug in a three-drug protocol, midazolam is not a barbiturate, and it "can trigger a

paradoxical reaction that would prevent even the sedative properties of the drug from taking

effect."  <u>Id</u>. at 7.  He contends that this reaction is "particularly likely" to occur in individual's

with "brain-related conditions" like "extreme anxiety."  <u>Id</u>.  Plaintiff states that he has a

---

[7] The Court references the page numbers used in the Appendix to Amended Complaint (Doc. 16), not those page numbers assigned by the electronic filing system.

chronic history of extreme anxiety, as alleged in the Amended Complaint. Id. He suggests that this paradoxical reaction may render him immune to the consciousness check during the execution process. Id. Finally, Plaintiff asserts that Florida's executions of William Happ, Askari Muhammad, and Darius Kimbrough (although inconclusive), and Ohio's execution of Dennis McGuire, evidence a "dramatically high rate of consciousness" when a state utilizes midazolam in its execution protocol. Id.

Very recently,[8] in Muhammad, 2013 WL 6844489, at *8, this Court summarized the state of the law in this Circuit concerning a death-sentenced inmate's Eighth Amendment claim attacking the use of a particular drug in an execution protocol as unconstitutional:

> The Eleventh Circuit has explained that to state an Eighth Amendment claim, a plaintiff must establish that "(1) the State is being deliberately indifferent (2) to a condition that poses a substantial risk of serious harm to [the inmate]." Valle v. Singer, 655 F.3d at 1225. In particular, in the lethal injection context, an inmate must "show an objectively intolerable risk of harm that prevents prison officials from pleading that they were subjectively blameless for purposes of the Eighth Amendment." Id. (quoting DeYoung v. Owens, 646 F.3d at 1319, 1325 (11th Cir. 2011)).
>
> As noted by the Supreme Court, "speculation cannot substitute for evidence" that the use of midazolam hydrochloride is "'sure or very likely to cause serious illness and needless suffering.'" Brewer v. Landrigan, - U.S. -, 131 S.Ct. 445, 178 L.Ed.2d 346 (2010) (quoting Baze, 553 U.S. at 50); Baze, 553 U.S. at 50 (noting that, simply because an execution method may accidentally result in pain does not establish the sort of objectively intolerable risk of harm necessary to establish an Eighth Amendment violation); Valle v. Singer, 655 F.3d at 1233 ("mere speculation cannot substitute for evidence that the use

---

[8] This Court's decision in Muhammad, 2013 WL 6844489 (M.D. Fla. Dec. 27, 2013), was rendered approximately a month and a half ago.

of pentobarbital will or very likely will cause serious illness and needless suffering").

> "In the lethal injection context, 'the condemned inmate's lack of consciousness is the focus of the constitutional inquiry.'" Valle v. State, 70 So. 3d 530, 539 (Fla. 2011) (per curiam) (quoting Ventura v. State, 2 So. 3d 194, 200 (Fla. 2009) (per curiam), cert. denied, 129 S.Ct. 2839, 174 L.Ed.2d 562 (2009)), cert. denied, - U.S. -, 132 S.Ct. 1, 180 L.Ed.2d 940 (2011). The Florida protocol requires that the execution team confirm that the inmate is unconscious after administration of the first drug, midazolam hydrochloride; thus if done correctly, there is no substantial risk of harm from administration of the second and third drugs. See Baze, 553 U.S. at 49 ("proper administration of the first drug, sodium thiopental, eliminates any meaningful risk that a prisoner would experience pain from the subsequent injections of pancuronium and potassium chloride").

Recognizing that this case may turn on Plaintiff's ability to differentiate his claims and evidence from Muhammad, as previously noted, the Court requested additional briefing and conducted a limited evidentiary hearing. The Court finds Plaintiff has failed to present evidence to substantiate his claim. Indeed, Plaintiff has failed to show that midazolam is "sure or very likely to cause serious illness and needless suffering."

At the evidentiary hearing, Plaintiff produced Dr. David Lubarsky, M.D., a board certified anesthesiologist,[9] as his expert. Tr. at 22-23. Of import, when critically examined, Dr. Lubarsky's testimony relies on unidentified published literature while admitting the absence of published literature[10]; chooses open-ended and equivocal descriptors when

---

[9] Declaration, App. at 16.

[10] Tr. at 24/8-11; Tr. at 31/13-14; Tr. at 113/17-19.

21

convenient[11]; acknowledges the absence of knowledge regarding premises upon which his opinions are based[12]; substitutes beliefs for scientific data[13]; admits aspects of his opinions are based upon theory and postulates[14]; offers arguable inconsistencies in bases for his opinion[15]; fails to reasonably account for alternative causes of problematic effects[16]; acknowledges weaknesses in methodology relied upon to support his opinions[17]; draws comparisons without accounting for material differences in the matters compared[18]; chooses not to respond to critical inquiries[19]; and admits aspects of his opinions concern matters about which he has very little experience[20];   In sum, taken as whole, Dr. Lubarsky's testimony is essentially speculative[21] and insufficient to meet Plaintiff's burden.

---

[11] Tr. at 27/11 ("primarily"); Tr. at 27/11-12 ("almost exclusively"); Tr. at 27/14-15 ("almost never"); Tr. at 32/14-16; ("very possible", "reasonable to assume", "it depends").

[12] Tr. at 32/21-24 ("never been studied"); Tr. at 34/14-15 ("mechanism of action is not entirely understood"); Tr. at 38/22-25 ("so little data"); Tr. at 39/9-10 ("not been settled scientifically"); Tr. at 55/19 ("tend to not focus on").

[13] Tr. at 32/25; Tr. at 39/6-10; Tr. at 45/22 through Tr. at 46/17; Tr. at 49/1-13.

[14] Tr. at 34/16; Tr. at 35/14-16; Tr. at 46/6.

[15] Compare Tr. at 35/18-21 with Tr. at 53/10 through 54/16.

[16] Tr. at 39/25 through Tr. at 40/2; Tr. at 41/21-23.

[17] Tr. at 45/12-14.

[18] Tr. at 54/22 through 57/4.

[19] Tr. at 71/3-6.

[20] Tr. at 57/24 through 58/4.

[21] Dr. Lubarsky admitted with respect to at least one term important to the Court's consideration, there is a "looseness" in his field.  Tr. at 58/23-24.

22

The Court will address Plaintiff's particular allegations.  First, Plaintiff argues that midazolam is not routinely used as a sole anesthetic because it has no analgesic properties and without the addition of an opioid or barbiturate, the use of midazolam alone would not protect a person from the noxious and painful stimuli of vecuronium bromide and potassium chloride.  He claims midazolam is only a sedative, not an anesthetic; therefore, it is not designed to induce a surgical plane of anesthesia by itself as it has no pain reducing qualities.

To counter Dr. Lubarsky's Declaration and testimony, the state produced Dr. Roswell Lee Evans, a pharmacologist, accepted by the Court as an expert.  Tr. at 79-82.  Dr. Evans addressed Plaintiff's contention that the use of midazolam in the protocol (without administering an opioid or barbiturate) would not protect a person from noxious and painful stimuli.  Dr. Evans attested that 250 milligrams would render the person incapable or unaware of noxious stimuli or pain, creating "an anesthetic situation."  Id. at 85.  Of import, he testified that because midazolam blocks GABA,[22] id., in high doses, "people are rendered so deeply in an anesthetic state they're really not going to be able to discern pain."  Id. at 86.  Dr. Evans further explained that pain has not been an issue because of the "dose-related phenomenon" in which an increased dose results in an increased effect, resulting in the person being placed "into almost a comatose kind of state."  Id. at 86, 87.

With regard to the question of whether a drug with analgesic properties should be administered during the execution process, Dr. Evans explained that the reason an opiate is added during major surgical procedures is because much lower doses of midazolam are

[22] Gamma-aminobutyric acid.

23

being administered in a surgical setting, and in combination, the midazolam and the narcotic stabilize the response from the patient as the drugs distribute throughout the body. Id. at 87. When asked whether the administration of two syringes, containing 250 milligrams of midazolam in each syringe, would render the individual "insensate, unconscious and incapable of feeling pain," Dr. Evans responded that he had no doubt that it would "to a reasonable degree of medical or pharmacological certainty[.]" Id. at 87-88. As to whether the effect of large doses of midazolam on consciousness, as compared to large doses of sodium thiopental or pentobarbital on consciousness, is similar or dissimilar, Dr. Evans concluded the effect "would be quite similar." Id. at 90.

Dr. Evans readily admitted that, in a clinical situation or surgical setting, midazolam is typically administered as a pre-medication sedative prior to some anesthetic. Id. at 93-94. He pointed out, however, that midazolam is used to maintain a comatose state after trauma. Id. at 101-102. He attested with respect to the "insensate piece[,]" midazolam "is as appropriate as it can be[.]" Id. at 102-103. He also readily admitted that midazolam has no analgesic properties. Id. at 94. He concluded it is "very unlikely" that a person administered 500 milligrams of midazolam, with his receptors blocked by a clinical overdose of the drug, would feel any noxious stimuli.[23] Id. at 110-11.

─────────────────────

[23] Even if the character of some of Dr. Evans' testimony might be characterized as speculative, which the Court acknowledges, it is Plaintiff's burden to establish the "sure or very likely" risk of "serious illness and needless suffering." If the infirmity of speculation were removed so that it could be said both expert opinions are reliable, a different outcome would not result from these diametrically opposed opinions. By definition, the heavy burden of showing, through evidence, "a substantial likelihood of success" on the merits of a claim cannot result from equipose.

Based on the testimony of both experts, it is clear that midazolam does not have analgesic qualities, but this is of no consequence because, the credible evidence shows that when midazolam is properly administered in the massive dose required by the Florida protocol, it will render the individual insensate to noxious stimuli by placing the individual in an anesthetic state, unable to discern pain.  The effect of midazolam is quite similar to that of sodium thiopental or pentobarbital on consciousness, and those anesthetizing drugs were found to sufficiently anesthetize an individual prior to the introduction of the other two drugs of the protocol.  See Pardo, Ferguson, and Valle.  It follows, that a drug like midazolam, which renders the individual unconscious and insensate, constitutes a substitution of one anesthetizing drug for another in the protocol, and Plaintiff has not established that this substitution presents an "intolerable risk of harm" to Plaintiff or is sure or very likely to cause his serious illness or needless suffering.  See Brewer.

Next, in a related issue, Plaintiff contends that there is no evidence that supports a claim that 500 milligram of midazolam produces a state of unconsciousness that would ensure the person is not going to be subject to serious pain and suffering.  In support, he references Florida's executions of William Happ, Askari Muhammad, and Darius Kimbrough (although inconclusive), and Ohio's execution of Dennis McGuire, as evidence of a dramatically high rate of consciousness when midazolam is used in an execution protocol.[24]

---

[24] The Court is not convinced that Ohio's use of a two-drug protocol (apparently calling for a small dose of midazolam followed by or combined with an overdose of an opiate), as administered during the execution of Dennis McGuire, is sufficiently similar to Florida's execution protocol to aid this Court in rendering its decision in this matter.

With regard to the execution of William Happ, the Florida Supreme Court in Muhammad, stated:

> The circuit court further concluded that the evidence established that even if Happ moved after administration of midazolam hydrochloride during his execution in October 2013, such movement does not equate to pain. We agree that these findings are supported by competent, substantial evidence. Further, competent, substantial evidence established that Happ's movement, reported by several news reporters whose articles were reviewed by Dr. Heath prior to his testimony, does not necessarily equate with consciousness.

Muhammad v. State, No. SC13-2105, 2013 WL 6869010, at *10 (Fla. Dec. 19, 2013) (per curiam) (not released for publication in the permanent law reports, subject to revision or withdrawal), cert. denied, 2014 WL 37226 (U.S. Jan. 7, 2014) (Nos. 13-8030, 13A674). Even after consideration of the testimony from the February 5th evidentiary hearing, there is no evidentiary or legal basis for this Court to disagree with this finding. Plaintiff's unsupported speculation to the contrary "cannot substitute for evidence that the use of [midazolam] will or very likely will cause serious illness and needless suffering." Valle v. Singer, 655 F.3d at 1233.

With respect to the assertion that Muhammad opened an eye during the execution process, Dr. Evans testified that "when somebody goes into a comatose state or a deep surgical anesthesia [sic], their eyes oftentimes will open." Tr. at 111. Even assuming Muhammad opened an eye during the execution process, Dr. Lubarsky's speculation that this equates with pain does not constitute evidence of the same. The Court finds that Plaintiff has failed to distinguish this case from Muhammad in this regard, and there is

26

competent, substantial evidence that Happ's movement (and Muhammad's, if his eye opened) does not necessarily equate to pain or with consciousness.

After reviewing the written submissions as well as the testimony of Dr. Lubarsky and Dr. Evans, the Court concludes that the evidence presented is wholly insufficient to demonstrate that the use of 500 milligrams of midazolam would not render a person unconscious, nor has their been sufficient evidence to show that the individual would be subject to a demonstrated risk of severe pain by the use of this drug as the first drug in the three-drug protocol. After careful consideration of Dr. Lubarsky's testimony, the Court finds that Plaintiff has failed to establish that Florida's protocol, using a high dose of midazolam as the anesthetizing drug in the protocol, ignores a "sure or very likely" risk of serious pain and "needless suffering" which creates a "demonstrated risk of severe pain" that is "substantial when compared to the known and available alternatives." Baze, 553 U.S. at 50, 61 (internal quotations and citation omitted).

Plaintiff submits that the use of midazolam in the Midazolam Protocol involves a substantial risk of paradoxical reactions and adverse reactions. In support of this contention, he states that midazolam is not a barbiturate, and midazolam can trigger a paradoxical reaction that prevents the sedative properties of the drug from taking effect. He also claims that a paradoxical reaction is particularly likely to occur if a person has a brain-related condition like extreme anxiety, and he alleges he chronically suffers from extreme anxiety. As an extension of this claim, he states that this paradoxical reaction may render him immune to the state's consciousness check during the execution process.

27

Plaintiff must demonstrate a "substantial likelihood that he would eventually prevail on the merits of his 'as-applied' challenge." <u>Siebert v. Allen</u>, 506 F.3d 1047, 1049 (11th Cir. 2007) (per curiam).   Although Plaintiff alleges that he chronically suffers from extreme anxiety, he failed to submit any medical records supporting this contention in his Appendix or Supplemental Appendix.  Assuming arguendo that he suffers from extreme anxiety, any estimation as to what side effects may present during his execution is wholly speculative.

Dr. Evans, in his testimony, agreed with Dr. Lubarsky that paradoxical reactions occur with the administration of benzodiazepines like midazolam, and Dr. Evans stated that he had actually seen the response in practice.  Tr. at 88.  He noted that paradoxical reactions usually occur at much lower doses, as typically used in surgical settings.  <u>Id</u>.  Of importance, he stated the incidence of this response in a normal therapeutic setting is **"less than 1 percent**[.]"  <u>Id</u>. (emphasis added).  He based this conclusion on his study of research into paradoxical reactions and on his own experience.  <u>Id</u>.  He described the paradoxical response as "a rage reaction" or a "combative" response.  <u>Id</u>.

Dr. Evans further explained that this 1 percent paradoxical reaction occurs when 2 to 5 milligrams have been administered, blocking "GABA receptors which are inhibitory to behaviors[.]"  <u>Id</u>. at 88, 89.  He testified that he had not experienced or read of anything which supports a conclusion that there would be a paradoxical reaction if a large dose of midazolam, like the amount set forth in Florida's protocol, were administered.  <u>Id</u>. at 89.  Dr. Evans said that it was "very likely" that when a very large dose of midazolam is administered, a person would skip through the paradoxical reaction and go straight to unconsciousness because "we're really saturating all these receptors very, very quickly with this drug."  <u>Id</u>. at

28

89, 90.  He further noted that "[o]ne of the beauties" of midazolam is it is "so fast-acting." Id. at 90.  Of note, Dr. Evans mentioned that there have been reports of paradoxical reactions with the use of sodium thiopental and pentobarbital, but "not much in terms of incidence or dose-related phenomena."  Id.

Dr. Lubarsky attested that "in a broad patient population, the incidence [of a paradoxical reaction] is probably around 1 percent in select subpopulations."  Id. at 34.  He explained that the mechanism is not "entirely understood," and exists in the "entire class of benzodiazepines."  Id.  He noted that there is a much higher risk of paradoxical reactions in people "with mental disturbances, learning disorders, panic and anxiety disorders, and people who get –- who are prone to combative or impulsive behaviors and those who get higher doses."  Id.  He claims the incidence "can go up to 60 percent[,]" depending on the drug and its administration.  Id.

In contrast to Dr. Evans, Dr. Lubarsky testified that the administration of barbiturates does not result in paradoxical reactions.  Id. at 35.  Dr. Lubarsky explained that if a benzodiazepine is not working, the solution is not a larger dose of a benzodiazepine, but a "reversal of the effect of benzodiazepine."  Id.  He stated that anybody "prone to an anxiety disorder or panic attack has an increased risk of paradoxical reactions."  Id.  He opined that using an untested dose of a benzodiazepine on a known, resistant population amounts to "unwise experimentation."  Id. at 42.

Dr. Lubarsky explained that the administration of a low dose of midazolam in a normal person would result in "about a 1 in 100 chance of having a paradoxical reaction."  Id. at 55. He attested that it is difficult to study paradoxical reactions.  Id.  He agreed that it is

addressed in literature as "combativeness, talkativeness." Id. He noted that the person is "not reacting as expected" and is "not fully sedated[.]" Id. at 56. He explained that the paradoxical reaction is not always apparent to the practitioner. Id. It may be evidenced as "not becoming sedated," but upon administration of more drugs, this reaction worsens. Id. He testified that the more common side effects are excitability, lack of sedation, and discoordinated movements. Id. With regard to the probability that someone would have a paradoxical reaction that was not an overt reaction ("appearing unconscious but not showing any signs of a paradoxical reaction"), Dr. Lubarsky, when asked if this would be a much smaller probability, responded that it "would be less likely[.]" Id. at 57.

Upon careful review of Dr. Lubarsky's testimony, he did not state that Plaintiff would have an atypical reaction to midazolam. Plaintiff may have only a 1 percent risk of a paradoxical reaction. If his alleged extreme anxiety comes into play, he may have a somewhat greater risk of a paradoxical reaction. This paradoxical reaction, however, would, in most cases, be overt and recognized as an atypical reaction to a sedative or anesthetic. Having a paradoxical reaction that was not overt would be even more "less likely."

"This sort of speculation cannot meet the standard of a 'sure or very likely risk of serious pain . . . that is substantial when compared to the known and available alternatives.'" Cooey v. Strickland, 604 F.3d 939, 944 (6th Cir.), cert. denied, 559 U.S. 1118 (2010). This Court is not convinced that Plaintiff has demonstrated an "objectively intolerable risk of harm." In essence, Plaintiff has not demonstrated "the extent of any tolerance of the midazolam." Id. at 945. The lack of any quantification as to the risk of Plaintiff having a non-overt paradoxical reaction that could not be determined by the required consciousness check

during Florida's execution process simply does not support a showing of a demonstrated risk of harm "which is either objective or intolerable." Id.

Additionally, Plaintiff questions the sufficiency and effectiveness of the consciousness check mandated by Florida's lethal injection protocol. This Court, in Valle v. Singer, Case No. 3:11-cv-700-J-34TEM, found that Florida's protocol requires a consciousness check after the administration of the first drug, and prior to the administration of the second drug of the three-drug protocol, and that the execution "cannot proceed until the individual is rendered unconscious." Valle v. Singer, 655 F.3d at 1233. Therefore, the Court will presume that the Florida Department of Corrections will follow its procedures and Plaintiff will not be injected with the final two drugs until he is rendered unconscious.

In conclusion, Plaintiff has not demonstrated that "a substantial likelihood of success on the merits of his 'as applied' claim." Siebert, 506 F.3d at 1050. Again, "[s]ome risk of pain is inherent" in any execution process, and "the Constitution does not demand the avoidance of all risk of pain[.]" Baze, 553 U.S. at 47. Plaintiff has not shown a substantial likelihood of success on the merits of his Eighth Amendment claim with respect to the use of midazolam as the first drug in the three-drug protocol. He has not shown that the use of midazolam in his upcoming execution is "sure or very likely to cause serious illness and needless suffering." Baze, 553 U.S. at 50.

Plaintiff also contends that midazolam will not itself cause death. He offers the opinion of Dr. Lubarsky to support this contention. Dr. Lubarsky testified that an LD50 test is "the lethal dose at which 50 percent of those given that dose will die from a single drug." Tr. at 43. He noted the test is traditionally done on small mammals, like rats and mice. Id.

31

He defined LD50 as being "when you give a specific dose, an escalating dose, at what point will 50 percent of the animals pass away and 50 percent survive." Id. He further testified the main purpose of the test is to "show the difference between an effective dose, meaning in this case sedation or anxiolysis, which is reducing anxiety, and the death dose." Id. at 44. Dr. Lubarsky attested that he came up with an LD50 of 4,000 milligrams for Plaintiff. Id. at 45. He stated that it is unknown whether "mice data" applies "exactly to humans[.]" Id.

Dr. Lubarsky further testified that he expected no different results from injecting someone with 50 milligrams of midazolam compared with 100 milligrams. Id. at 57. He attested there is a "ceiling effect with midazolam[.]" Id. at 70. He testified it does not produce EEG (electroencephalography) silence, nor does it produce a coma. Id. He then stated: "[w]e know it cannot reliably produce death" in "the same way that barbiturates do at high doses." Id. at 70-71. When asked if 500 milligrams of midazolam would induce a coma in a human being, he responded: "I have no idea, because no one has ever given anybody 500 milligrams." Id. at 71. He explained that when looking at barbiturates compared to midazolam, there are different mechanisms of action involved and different depths of depression of neuronal activity in the brain. Id. When asked if a person given 500 milligrams of midazolam would be "sure or very likely to suffer serious bodily injury and harm in the lethal injection context," Dr. Lubarsky said he could not give assurances that it will or will not as there is no data, but he concluded that one "cannot deliver a surgical plane of anesthesia with midazolam as a sole anesthetic." Id. at 72.

In Muhammad, this Court referenced the testimony provided at the state evidentiary hearing by both Dr. Heath, a board certified anesthesiologist, and Dr. Evans, and found it

32

"**establishes** that midazolam hydrochloride is routinely used as a pre-anesthetic and as an anesthetic in minor surgical procedures, and that the 500 milligram dosage called for in Florida's lethal injection protocol would not only induce unconsciousness, **but would ultimately cause death**." Muhammad, 2013 WL 6844489, at *6 (emphasis added). The Court relied on the testimony of the two experts who testified in the state court evidentiary proceedings. The Court's decision in Muhammad is certainly very persuasive authority.

At the evidentiary hearing on February 5th, Dr. Evans readily countered Dr. Lubarsky's assertion that 500 milligrams of midazolam would not cause death. Dr. Evans referenced specific instances of death following the injection of midazolam. He testified that 250 milligrams of midazolam would cause "respiratory arrest, cardiac arrest, severe oxygen deprivation and death[.]" Tr. at 83. In particular, he testified "[t]here are reported cases of as little as 71 milligrams of this drug causing death in humans." Id. He explained that 500 milligrams, as used in the Florida protocol, is "40-something times more than the normal dose used in therapeutic medicine," and it would have "pretty devastating effects pharmacologically." Id.

Dr. Evans testified that 250 milligrams would render an individual unconscious in two to four or five minutes, as it is "very rapidly absorbed from the system and penetrates tissue very quickly, so you're going to get a huge impact on the central nervous system, very, very quickly." Id. at 83-84. He testified that a therapeutic dose would be about five milligrams for a 180 pound man. Id. at 84.

Dr. Evans testified that, in large doses, like that used in the Florida protocol, death would not be instantaneous, but would be effected "[f]airly quickly." Id. at 95. He explained

that midazolam will "shut down the central nervous system," and "this is not going to take very long at all," but within the protocol at issue, there are "certainly other agents that are going to be in play here." Id. Dr. Evans said although there is no "real evidence, other than anecdotal," the impact of the drug would cause death in five to ten minutes. Id. at 95-96.

Dr. Evans testified that a "ceiling effect" as it relates to midazolam has been postulated. Id. at 98. He elaborated:

> And whether you actually reach that ceiling effect or not is a little
> bit unclear.   As I said before, GABA receptors are actually
> throughout the entire body, and hypothetically if you saturated
> those receptors, that's as much an impact as you're going to get
> from the drug.  But, frankly, if you have blocked those GABA
> receptors, you've achieved your pharmacological outcome that
> you actually want.

Id.

Dr. Evans recognized the LD50 in rats for midazolam is 215 milligrams per kilogram, and the comparable calculation for a 70-kilogram person would result in an LD50 of 15,000 milligrams. Id. at 105. Again, he pointed out that there "is a pharmacodynamic impact" involved, and it has "taken as little as 70 milligrams of this drug" to cause the death of a human being. Id. at 105. He stated: "[a]nd we try to extrapolate what happens in rats to humans, and I can tell you that the pharmacodynamic effects are different. So, you know, telling me that we have to have 15,000 milligrams of drug, of midazolam, to kill 50 percent of humans is probably not very accurate." Id. at 106.   He explained that in the dose/response relationship, when you reach higher doses, it results in anesthesia, the shutting down of body systems, and eventually death. Id. at 107.   He attested that there is

"a cascade as the whole system begins to shut down, and it happens very rapidly with [midazolam]." Id.

In addressing this ground, the Court is highly persuaded by the Court's decision in Muhammad that the state court testimony of two experts established that midazolam would ultimately cause death.  Recognizing that Dr. Evans attested that there are reported cases of as little as 71 milligrams of midazolam causing death in humans, the Court credits his testimony that the pharmacodynamic impact of a large dose of midazolam would result in a cascade effect with the whole body rapidly starting to shut down, leading to anesthesia, the shutting down of body systems, and ultimately death.  Dr. Evans noted the rapidity of this drug and its huge impact on the central nervous system.  With respect to the so-called "ceiling effect," he noted that once the GABA receptors are saturated and blocked, the desired pharmacological outcome would still be achieved.  Therefore, the ceiling effect would not change the ultimate outcome, which is death.

Relying on this Court's persuasive decision in Muhammad, and crediting Dr. Evans' testimony that specific instances of death have resulted from the administration of midazolam in humans and his supporting related testimony, the Court is not persuaded that Plaintiff has shown a substantial likelihood of success on the merits of his claim with respect to the use of midazolam as the first drug in the three-drug protocol.  Indeed, he has failed to show that the use of midazolam in his upcoming execution is "sure or very likely to cause serious illness and needless suffering[]" in violation of the Eighth Amendment to the United States Constitution.  Baze, 553 U.S. at 50.

35

In his Motion to Stay, Plaintiff claims that Florida's Midazolam Protocol, a three-drug protocol, violates the evolving standards of decency as it is no longer tolerable under the Eighth Amendment given the existence and increasingly widespread use of a one-drug (barbiturate) protocol.  The Court finds that Plaintiff has not shown a substantial likelihood of success on the merits of this claim.  Of import, this Court in <u>Muhammad</u> rejected this assertion.  At the time of that decision, thirteen states had adopted a single-drug protocol.  <u>Muhammad</u>, 2013 WL 6844489, at *8.  In his Motion to Stay, Plaintiff states that fourteen states have now adopted a one-drug execution protocol.[25]  Motion to Stay at 8.  This number certainly does not show a groundswell of states supporting a change to a one-drug protocol based on "the evolving standards of decency that mark the progress of a maturing society."  <u>Atkins v. Virginia</u>, 536 U.S. 304, 312 (2002) (quoting <u>Trop v. Dulles</u>, 356 U.S. 86, 100-101 (1958) (plurality opinion)).

As noted previously, the mere showing of a slightly or marginally safer alternative is not enough.  <u>Baze</u>, 553 U.S. at 51.  Much more is required to make a showing necessary to adequately support a claim of an Eighth Amendment violation:

> Permitting an Eighth Amendment violation to be established on such a showing would threaten to transform courts into boards of inquiry charged with determining "best practices" for executions, with each ruling supplanted by another

---

[25] During argument, Tr. at 118, Plaintiff's counsel mentioned that Louisiana adopted a one-drug protocol; apparently, Louisiana's adoption of an execution protocol is in a state of flux as evidenced by the state agreeing to the issuance of a temporary restraining order and the Court enjoining the state from executing Plaintiff Christopher Sepulvado. <u>Jessie Hoffman and Christopher Sepulvado v. Bobby Jindal, etc.; et al.</u>, Case No. 3:12-cv-796-JJB-SCR (M.D. La. Feb. 3, 2014) (Doc. 119).  <u>See</u> <u>Sepulvado v. Jindal</u>, 729 F.3d 413 (5th Cir. 2013) (reversing a district court decision granting a stay on procedural due process grounds), <u>petition</u> <u>for</u> <u>cert</u>. <u>filed</u>, (U.S. Jan. 27, 2014) (Nos. 13-892, 13A778).

round of litigation touting a new and improved methodology. Such an approach finds no support in our cases, would embroil the courts in ongoing scientific controversies beyond their expertise, and would substantially intrude on the role of state legislatures in implementing their execution procedures - a role that by all accounts the States have fulfilled with an earnest desire to provide for a progressively more humane manner of death. See Bell v. Wolfish, 441 U.S. 520, 562, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) ("The wide range of 'judgment calls' that meet constitutional and statutory requirements are confided to officials outside of the Judicial Branch of Government").

Id.

Even if fourteen states have adopted a one-drug protocol, a decision from this Court finding the Florida Department of Corrections must adopt a one-drug protocol would transform this Court into a board of inquiry considering the best practices for a state's execution process, something which this Court cannot do. Id. As instructed in Baze, Plaintiff must first show that Florida's current protocol creates a "demonstrated risk of severe pain," id. at 61. Plaintiff has failed to do so. Thus, in light of all of the above, Plaintiff cannot successfully challenge Florida's three-drug protocol by contending that the one-drug protocol may be a better execution protocol for Florida to adopt. Id. at 51. Finally, Plaintiff has not shown that "the risk [of the three-drug protocol] is substantial when compared to the known and available alternatives." Id. In conclusion, Plaintiff has not shown a substantial likelihood of success on the merits of this Eighth Amendment claim.

## C.   Plaintiff's Fourteenth Amendment Claim

In Sell, the United States Supreme Court held an inmate has a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs. The court established a four-prong test for determining when the forced administration of medically

37

appropriate drugs is constitutionally protected.  The court required findings regarding: (1) the existence of "important governmental interests[;]" (2) the "involuntary medication will significantly further those concomitant state interests[;]" (3) the involuntary medication being "necessary" to further the important interests; and (4) the administration of the drug being "medically appropriate, i.e., in the patient's best medical interest in light of his medical condition."  Sell, 539 U.S. at 180-81 (emphasis in original).  Plaintiff asserts he has a due process liberty interest, relying on Sell, and he asks that the Sell test be applied to prevent Florida's administration of vecuronium bromide in the lethal injection execution process.

First, the Court must determine whether Plaintiff is asserting a substantive due process claim or a procedural due process claim.[26]  In order to make this determination, the Court looks to the two cases upon which the Supreme Court in Sell relied; the "[t]wo prior precedents" that "set forth the framework" for answering the question presented.  Sell, 539 U.S. at 177-78.  The two Supreme Court cases are Washington v. Harper, 539 U.S. 166, and Riggins v. Nevada, 504 U.S. 127.  Harper set forth substantive due process standards under the Fourteenth Amendment to the United States Constitution, holding that the substantive protections of the Due Process Clause limit the forced administration of psychotropic drugs to those whose medical interests would be advanced by the use of the antipsychotic drugs. Harper, 494 U.S. at 227.  The Court explained:

> It is axiomatic that procedural protections must be examined in terms of the **substantive rights at stake. But identifying the contours of the substantive right remains a task distinct from deciding what procedural protections are necessary to**

---

[26] Neither the Amended Complaint nor the Motion to Stay state whether Plaintiff is relying on a substantive or procedural due process claim.

> protect that right. "[T]he substantive issue involves a
> definition of th[e] protected constitutional interest, as well
> as identification of the conditions under which competing
> state interests might outweigh it. The procedural issue
> concerns the minimum procedures required by the
> Constitution for determining that the individual's liberty
> interest actually is outweighed in a particular instance."
> Mills v. Rogers, 457 U.S. 291, 299, 102 S.Ct. 2442, 2448, 73
> L.Ed.2d 16 (1982) (citations omitted).

Harper, 494 U.S. at 220 (emphasis added).

Riggins held that forced antipsychotic drugs on a pretrial detainee "absent a finding of overriding justification and a determination of medical appropriateness" creates an unacceptable risk of "trial prejudice." Riggins, 504 U.S. at 135, 138. Thus, the court found that the State of Nevada contravened the substantive-due-process standards set forth in Harper when it forced medication on the criminal defendant but failed to comply with Harper.

Defendants, in their Motion to Dismiss and/or for Summary Judgment at 41, submit that there is no constitutionally protected liberty interest in avoiding execution drugs. Of import, by its nature, the execution process is not a medical procedure, and by design, it is not medically appropriate for the condemned. Indeed, the execution process is designed to effect death, not restoration of the individual's mental or physical health. In Florida's protocol, the administration of vecuronium bromide is not related to medical treatment, as it is the second drug administered in the State's three-drug execution process.

Upon review, Plaintiff fails to identify the protected constitutional liberty interest at stake in this proceeding. It is obviously not the same as that presented in Sell, Harper, and Riggins. The Supreme Court of Louisiana succinctly explained the difference between the

39

state's use of drugs in involuntary medical treatment and its use of drugs in an execution

protocol as part of capital punishment:

> The Supreme Court held that the forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty, but that, taking into account the state's unique interest in prison safety and security, substantive due process allows a mentally ill inmate to be treated involuntarily with antipsychotic drugs where there is a determination that "the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." Riggins v. Nevada, 504 U.S. 127, 112 S.Ct. 1810, 1815, 118 L.Ed.2d 479 (1992), quoting and interpreting Washington v. Harper, supra, 494 U.S. at 227, 110 S.Ct. at 1039. Therefore, under Harper, "forcing antipsychotic drugs on a convicted prisoner is impermissible absent a finding of overriding justification and a determination of medical appropriateness." Id.

> The Supreme Court's holding in Washington v. Harper is inherently inapposite to the present case. The state's object here is to forcibly administer antipsychotic drugs to a prisoner in order to implement his execution. In contrast, the state's object in Harper was to require a prisoner to accept appropriate medical treatment that was in his own best medical interest. **Therefore, in the present case, the state's involuntary use of drugs on Perry must be vindicated if at all as a procedure that legitimately forms part of his capital punishment. It cannot be justified under Harper because forcible administration of drugs to implement execution is not medically appropriate.**

> But even if we overlook the incongruity of applying a medical treatment precedent in a capital punishment context, Harper still cannot be applied to yield the result desired by the state. **In Harper, the Supreme Court developed a substantive due process standard that requires the state to show that the prisoner is dangerous to himself or others and that the antipsychotic drug medical treatment is appropriate medically and in his best medical interest.** The state's proof in the present case simply does not measure up to this due process standard. This, of course, is not surprising because the Harper standard has nothing to do with the issues with which the trial court and the parties dealt with below, viz., whether Perry

40

> was competent for execution and whether he could be consistently maintained with drugs at a level of competency and executed in that condition.

State v. Perry, 610 So.2d 746, 54 (La. 1992) (emphasis added).  The Louisiana court, finding

Harper "inherently inapposite" and inapplicable, rested its decision on "state constitutional

rights of privacy or personhood and humane treatment."  Id. at 755.

Plaintiff asks that the Sell test (minimum procedures) be employed in the execution

context, referencing Singleton v. Norris, 319 F.3d 1018 (8th Cir.), cert. denied, 540 U.S. 832

(2003), and Nelson v. Campbell, 541 U.S. 637 (2004).  This Court will not reach the question

of needed procedural protections without first identifying the necessary substantive issue at

stake.

Of importance, Singleton did not apply Sell to the administration of drugs during an

execution process.  The liberty interest at issue in Singleton was the inmate's "interest in

being free of unwanted antipsychotic medication."  Singleton, 319 F.3d at 1025.  The court

identified the interrelated issues before it: "whether the State may forcibly administer

antipsychotic medication to a prisoner whose date of execution has been set and whether

the State may execute a prisoner who has been involuntarily medicated under a Harper

procedure."  Singleton, 319 F.3d at 1023.  The court concluded that the best medical interest

of Singleton must be made "without regard to whether there is a pending date of execution."

Id. at 1026.

Plaintiff's reliance on Nelson is also misplaced.  The issue in Nelson was whether a

cut-down procedure to access veins during an execution process violated the Eighth

Amendment to the United States Constitution.  Nelson, 541 U.S. at 639.  The Supreme Court

41

simply found that 42 U.S.C. § 1983 was the appropriate vehicle to raise an Eighth Amendment claim seeking a temporary stay of execution and permanent injunctive relief. Id. at 639.

Plaintiff does not have a substantive due process liberty interest similar to that found in Sell. There is no medical treatment issue before this Court. Using drugs for the purpose of carrying out the death penalty does not constitute medical treatment. It is part of the capital punishment process selected by the State of Florida, and the State's "strong interest in proceeding with its judgment" is at issue. Nelson, 541 U.S. at 649 (citation omitted). A condemned inmate does not have a liberty interest in avoiding the use of execution drugs. Therefore, the Sell test is inapplicable to the lethal injection execution process.

Although Plaintiff claims vecuronium bromide serves no medical purpose and should not be forcibly administered, none of the drugs used in Florida's lethal injection process are being administered for a "medical purpose" or have been deemed "medically appropriate" for a particular medical condition. Indeed, a massive overdose of midazolam is used in the protocol, an amount so high that it would not be deemed medically appropriate for treatment under any circumstances.

Former Secretary of the Florida Department of Corrections, James R. McDonough, attests in his Affidavit that in seeking to provide a "humane and dignified death[,]" the use of pancuronium bromide, a paralytic, in the three-drug protocol "prevents a physiological response to the death experience" and "preserves the dignity of the scene for both the person to be executed and for those witnessing it." App. at 98-99. Thus, he opines that the execution protocol preserves three essential components of "humaneness, dignity, and

42

death."  Id. at 98.  Although in the context of the Eighth Amendment, the Supreme Court in Baze noted that the state trial court found "[t]he Commonwealth has an interest in preserving the dignity of the procedure, especially where convulsions or seizures could be misperceived as signs of consciousness or distress."  Baze, 553 U.S. at 57.  The Supreme Court found Kentucky's decision to include a paralytic drug in its three-drug protocol did not constitute a violation of the Eighth Amendment.  Id. at 58.

Plaintiff has not shown a substantial likelihood of success on the merits of his Fourteenth Amendment claim with respect to the use of vecuronium bromide as the second drug in the three-drug protocol.[27]  The Supreme Court has "always been reluctant to expand the concept of substantive due process[.]"  Cnty. of Sacramento v. Lewis, 523 U.S. 833, 842 (1998) (quoting Collins v. Harker Heights, 503 U.S. 115, 125 (1992)).  Here, there is a particular Amendment, the Eighth Amendment, which "'provides an explicit textual source of constitutional protection' against a particular sort of government behavior[.]"  Albright v. Oliver, 510 U.S. 266, 273 (1994) (quoting Graham v. Connor, 490 U.S. 386, 395 (1989)).

_____

[27] To the extent Plaintiff attempts to raise a procedural due process claim, he has not shown a substantial likelihood of success on the merits of his Fourteenth Amendment claim with respect to the use of vecuronium bromide.  He has failed to show a liberty interest that was interfered with by Defendants, and that the Defendants failed to use constitutionally sufficient procedures to protect his recognized liberty interest.  Ky. Dep't of Corr. v. Thompson, 490 U.S. 454, 460 (1989).  Plaintiff has no "legitimate claim of entitlement" to a liberty interest in selecting which drugs will be used in effectuating his death.  Id.  To the extent he is seeking to prevent the use of a drug that may mask pain, that issue should be analyzed using the framework of the Eighth Amendment because the claim ultimately concerns whether Florida has adopted a procedure that creates a risk of pain that is "sure or very likely to cause serious illness and needless suffering," and in the case of seeking a stay, Plaintiff must make a showing that the protocol "creates a demonstrated risk of severe pain."  See Baze, 553 U.S. at 50, 61 (internal quotation and citation omitted).

Therefore, the guide for analyzing Plaintiff's claim must be the Eighth Amendment, not the "generalized notion of substantive due process[.]" Id. (citation and internal quotation marks omitted)).  To the extent Plaintiff is raising an Eighth Amendment claim, he has not shown a substantial likelihood of success on the merits of an Eighth Amendment claim with respect to the use of vecuronium bromide, a paralytic, in Florida's lethal injection protocol.[28]

**D.     Remaining prongs of the standard**

Because the Court has found that Plaintiff cannot demonstrate a substantial likelihood of success as to either his Eighth or Fourteenth Amendment claims (or any other claims), he cannot prevail on his Motion to Stay, and the Court therefore need not determine whether any of the remaining three factors weigh in his favor.  See Valle, 655 F.3d at 1225.

**VIII.   Res Judicata and Exhaustion of Administrative Remedies**

Defendants also raise the specter of res judicata.  In Muhammad, this Court, recognizing the "serious nature" of the issues raised in a capital case, decided to address the claims on the merits.  Muhammad, 2013 WL 6844489, at *6 n.9.  Here too, the Court is faced with a capital case with very serious issues.  Plaintiff's counsel, when addressing the Court at the evidentiary hearing, stated that he had three days to file the Second Successor Motion for Postconviction Relief in the state circuit court, he sought leave to amend and was denied leave to amend, and he requested an evidentiary hearing but this too was denied by the court.  Tr. at 132-33, 138-39.

_____

[28] Although Plaintiff limited his claims in his Motion to Stay, and the Court has addressed those claims (his three-pronged attack on the Midazolam Protocol), to the extent Plaintiff also relies on the additional claims raised in his Amended Complaint, he has failed to show a substantial likelihood of success on those claims.

On the other hand, as noted in the Supreme Court of Florida's decision in <u>Howell v.</u> <u>State</u>, No. SC14-167 (Fla. Feb. 6, 2014), "Chavez alleged very general challenges to the lethal injection protocol[.]" It was further noted that his claims raised in the state court "were completely speculative, and he 'failed to proffer any witnesses or evidence that he would present during an evidentiary hearing.'" <u>Id</u>. (quoting <u>Chavez v. State</u>, No. SC14-35, 2014 WL 346026 (Fla. Jan. 31, 2014)).   Plaintiff now presents this Court with the Declaration of Dr. Lubarsky, which prompted this Court to schedule an evidentiary hearing and address the issue of whether Plaintiff faces a substantial risk of serious harm. <u>Baze</u>, 553 U.S. at 50. Under these unique circumstances, the Court concludes that it is appropriate to address the merits of the Motion to Stay.  In sum, although Plaintiff's claims may be barred based on the doctrine of res judicata or because of a failure to fully exhaust administrative remedies prior to the filing of this case, the Court addresses the Motion to Stay on its merits due to the serious nature of this capital case, acknowledging that "'death is different' from every other form of punishment[.]" <u>Baze</u>, 553 U.S. at 84 (Alito, J., concurring).

## IX.    Conclusion

The protocol change substituting midazolam for the first drug in the three-drug protocol is not a substantial change to the protocol.  The Florida Department of Corrections has substituted one anesthetizing drug for another as the first drug in the execution protocol. Upon review, no other changes were made in the protocol.  Thus, Plaintiff has not shown a substantial likelihood of success on the merits of his claims because they are barred by Florida's four-year statute of limitations.  Finally, Plaintiff has not shown a substantial likelihood of success on the merits of his Eighth and Fourteenth Amendment claims or on

the merits of any other claims he raised.  He has not shown that his upcoming execution is "sure or very likely to cause serious illness and needless suffering."  <u>Baze</u>, 553 U.S. at 50. Therefore, Plaintiff's Motion to Stay is due to be denied.

Accordingly, it is hereby

**ORDERED**:

1.      Plaintiff's Motion for Temporary Restraining Order, Preliminary Injunction, and/or Stay of Execution and Supplemental Brief Regarding Muhammad (Motion to Stay) (Doc. 28) is **DENIED**.

2.      The Clerk shall telephonically notify counsel for the parties of the entry of this Order.

3.      The Clerk shall immediately notify the following capital case points of contact of this Order: (1) the United States Court of Appeals for the Eleventh Circuit; (2) the Governor's Office in Tallahassee, Florida; (3) the Secretary of the Florida Department of Corrections; (4) the Warden of Florida State Prison; and (5) the Attorney General's Office in Tallahassee, Florida.

4.      The Clerk shall immediately provide by email a copy of this Order to the Warden of Florida State Prison who shall immediately provide a copy of this Order to Mr. Chavez.

**DONE AND ORDERED** at Jacksonville, Florida this 10th day of February, 2014, at 5:58 p.m.

BRIAN J. DAVIS
United States District Judge

sa 2/10
c:
Counsel of Record